IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| VINCENT M. ALLEN, | ) | |
| AIS #169488, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:15-CV-317-MHT |
| | ) | [WO] |
| DR. HOOD, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## RECOMMENDATION OF THE MAGISTRATE JUDGE

### I.  INTRODUCTION[1]

This 42 U.S.C. § 1983 action is before the court on a complaint filed by Vincent

M. Allen, a state inmate, in which he alleges that the defendants acted with deliberate

indifference when they failed to refer him to a third free-word orthopedic surgeon for a

third opinion regarding potential treatment for his injured left hand. Doc. 1 at 6.  Allen

names as defendants Dr. Hugh Hood, former Associate Regional Director and current

Regional Director for Corizon—the contract medical care provider for the state prison

system—Woodrow A. Myers, the CEO of Corizon; and Dr. Bobby Crocker, the Regional

Director of Corizon until May of 2015.  Allen seeks declaratory and injunctive relief for

the alleged violation of his constitutional rights. Doc. 1 at 4 ("I want the court to rule in

---

[1] All documents and attendant page numbers cited herein are those assigned by the Clerk of this court in
the docketing process.

my favor, and have the court compel/order defendants to authorize orthopedic surgery to be performed on [my] damaged left (dominant) hand.").

The defendants filed special reports and relevant evidentiary materials in support of their reports, including affidavits and certified copies of Allen's medical records.  In these filings, the defendants deny that they acted with deliberate indifference to a serious medical need suffered by Allen.

After receiving the defendants' special reports, the court issued orders directing Allen to file a response to the reports, supported by affidavits or statements made under penalty of perjury and other evidentiary materials. Docs. 12 at 3–4 & 23 at 2.  These orders specifically cautioned that "unless within ten (10) days from the date of this order a party . . . presents sufficient legal cause why such action should not be undertaken . . . the court may at any time [after expiration of the time for the plaintiff filing a response] and without further notice to the parties (1) treat the special reports and any supporting evidentiary materials as a [dispositive motion] and (2) after considering any response as allowed by this order, rule on the motion in accordance with the law." Docs. 12 at 4 & 23 at 2–3.  Allen filed responses to these orders on August 11, 2015 and September 15, 2015.  Docs. 15 & 24.

Pursuant to the directives of these orders, the court deems it appropriate to treat the defendants' reports as a motion for summary judgment and concludes that summary judgment is due to be granted in favor of the defendants on the deliberate indifference claim presented in the complaint.

## II.  SUMMARY JUDGMENT STANDARD

"Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine [dispute] as to any material fact and that the moving party is entitled to judgment as a matter of law." *Greenberg v. BellSouth Telecomm., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (internal quotation marks omitted); Fed.R.Civ.P. 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.").  The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record, including pleadings, discovery materials and affidavits], which it believes demonstrate the absence of a genuine [dispute] of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593 (11th Cir. 1995) (holding that moving party has initial burden of showing there is no genuine dispute of material fact for trial).  The movant may meet this burden by presenting evidence indicating there is no dispute of material fact or by showing that the nonmoving party has failed to present appropriate evidence in support of some element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322–24; *Moton v. Cowart*, 631 F.3d 1337, 1341 (11th Cir. 2011).

The defendants have met their evidentiary burden.  Thus, the burden shifts to the plaintiff to establish, with appropriate evidence beyond the pleadings, that a genuine

dispute material to his case exists. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Celotex*, 477 U.S. at 324; Fed.R.Civ.P. 56(e)(3); *Jeffery*, 64 F.3d at 593–94 (holding that, once a moving party meets its burden, "the non-moving party must then go beyond the pleadings, and by its own affidavits [or statements made under penalty of perjury], or by depositions, answers to interrogatories, and admissions on file," demonstrate that there is a genuine dispute of material fact). This court will also consider "specific facts" pled in a plaintiff's sworn complaint when considering his opposition to summary judgment. *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1098 (11th Cir. 2014). A genuine dispute of material fact exists when a party produces evidence that would allow a reasonable factfinder to return a verdict in its favor such that summary judgment is not warranted. *Greenberg*, 498 F.3d at 1263; *Allen v. Bd. of Pub. Educ. for Bibb Cnty.*, 495 F.3d 1306, 1313 (11th Cir. 2007). "The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case." *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003) (citation omitted). "[T]here must exist a conflict in substantial evidence to pose a jury question." *Hall v. Sunjoy Indus. Group, Inc.*, 764 F. Supp. 2d 1297, 1301 (M.D. Fla. 2011) (citation omitted).

Although factual inferences must be viewed in a light most favorable to the plaintiff and *pro se* complaints are entitled to liberal interpretation, a *pro se* litigant does not escape the burden of establishing by sufficient evidence a genuine dispute of material fact. *See Beard v. Banks*, 548 U.S. 521, 525 (2006); *Brown v. Crawford*, 906 F.2d 667,

4

670 (11th Cir. 1990).  Thus, the plaintiff's *pro se* status alone does not compel the court to disregard elementary principles of production and proof in a civil case.

The court has undertaken a thorough and exhaustive review of all the evidence contained in the record.  After this review, the court finds that Allen has failed to demonstrate a genuine dispute of material fact in order to preclude the entry of summary judgment for the defendants.

### III.  RELEVANT FACTS[2]

On January 16, 2014, Allen was incarcerated at the Draper Correctional Facility and assigned a welding job with Alabama Correctional Industries.  "While . . . fabricating . . . a divider for an inmate transport van[,]" the cutting disk exploded causing Allen to suffer injuries to his left hand. Doc. 1 at 5.  Correctional medical personnel initially evaluated Allen's injuries and determined that he should be transported by ambulance to a free-world emergency room for treatment of the injuries to his hand. Doc. 9-3 at 52–53. As a result, Allen "was taken to Jackson Hospital's E.R. via Haynes Ambulance Service." Doc. 1 at 5.  Emergency room personnel performed x-rays of Allen's left hand, closed the wound with 19 stitches and released him for transport back to Draper. Doc. 1 at 5.  The emergency room physician discussed Allen's injury with Dr. Hussein Turki, an orthopedic surgeon employed by Alabama Orthopedic Specialists in Montgomery, Alabama. Doc. 9-3 at 72.  Dr. Mendez, the attending correctional physician, scheduled an appointment for Allen with Dr. Turki on January 22, 2014. Doc. 9-4 at 3.

---

[2] These facts are gleaned from the complaint and the undisputed medical records compiled by correctional medical personnel and two free-world orthopedic surgeons who evaluated the injuries to Allen's left hand.

During his initial evaluation of Allen, Dr. Turki observed that Allen suffered a comminuted fracture—a break or splinter of the bone into more than two fragments—of his left ring finger, and he "wrapped and splinted" Allen's hand. Doc. 9-4 at 3. Allen returned for a follow-up appointment with Dr. Turki on February 5, 2014, when Dr. Truki noted that Allen

> had a severe injury to his [left] hand . . . where he injured the dorsal aspect of his long finger with a fracture to his ring finger. It was a comminuted fracture at the articular junction of his MP joint. When I saw the patient, [on January 22, 2014], it had significantly tenuous skin. We opted to just treat it conservatively as his fracture was severely comminuted, and I just did not feel like there was anything I could do to make it better. It was overall aligned well, although it looked like the joint itself was subluxed. There was not much bone to work with.

Doc. 9-4 at 10.

Dr. Turki physically examined Allen's injured hand and observed that "[t]he laceration site looks good and viable. He has a fair amount of scar tissue forming to his long finger as well as his small finger, however. The ring finger he is able to flex and extend at the PIP and DIP joints, although limited by pain." Doc. 9-4 at 10. Dr. Turki further noted that the "[r]adiographs show again the MP joint looks like there is some subluxation, but overall alignment is well maintained." Doc. 9-4 at 10. Dr. Turki outlined the treatment plan for Allen as follows:

> The fracture is so comminuted and the skin so tenuous over it I just do not think there is anything I can do to make this better. Right now the soft tissue envelope looks like it is healing. I am concerned if I try to do anything for the bone, I am going to potentially risk the viability of the finger. I just would not do that. At this point, I would recommend splinting and motion to his other fingers. I will see him back in a month. I want to get another x-ray of his hand.

Doc. 9-4 at 10.  During this appointment, Dr. Turki removed Allen's stiches and applied

a "gauze wrap [with] hand brace." Doc. 9-4 at 8.

Allen presented for his follow-up appointment with Dr. Turki on March 28, 2014,

at which time Dr. Turki noted:

> His wounds have healed.  There are no signs of infection.  He has
> significant stiffness to his ring finger at the MP joint, PIP joint, and DIP
> join.  Passively, I can bend his PIP joint to about 50 degrees, DIP joint
> about 30 degrees.  MP joint has minimal motion in it to his ring finger.  The
> long finger has some stiffness in it as well.
> .  .  .    Radiographs show the fractures are all healed with some
> hyperextension deformity.

Doc. 9-4 at 18.  Allen maintains that during this appointment Dr. Turki told him "there

was a surgery he could perform to help me, but he wouldn't do it." Doc. 1 at 5.  It is clear

from Dr. Turki's notes that he decided against surgical intervention due to the potential

risk to the "viability of the finger." Doc. 9-4 at 10.  The records compiled by Dr. Turki

further demonstrate he advised Allen there would be "some limitations with his hand.  I

explained to him even whether we did anything initially or not he will have limitation[s].

I think anybody with this injury would have some limitations with their hand." Doc. 9-4

at 18.  Dr. Turki also explained potential surgical procedures as options "but without

therapy I would not do them.  I think he is just going to scar back in right now.  I

explained to him when he gets out of prison this is something that could potentially be

tried, but right now I think this is going to be the hand that he has.  He understands this

and we will see him back as needed.  I showed him how to do exercises on his own and

he can follow up as needed." Doc. 9-4 at 18.

On April 30, 2017, correctional medical personnel ordered that Allen receive three sessions of physical therapy for his injured left hand. Doc. 9-4 at 22.  A free-world physical therapist examined Allen on May 9, 2014 and compiled the following assessment:

> Feel he has limited potential but should improve modestly.  Not sure if he can ever be able to close his hand again and make a fist.  Would like that to be the case at the end of therapy intervention.  If not able to then surgery may be best option.  Also note, does not appear any tendon damage, just soft tissue adhesions and restrictions in the hand and multiple joints with inhibiting pain and scarring.

Doc. 9-4 at 23.

Upon completion of his final physical therapy session on June 10, 2014, the physical therapist advised Allen to continue with his exercises to increase joint mobilization, break down scar tissue, strengthen his hand and stretch his fingers. Doc. 9-4 at 25.  The therapist "suggest[ed] hand surgeon consult as skin healed with tight web space between 3rd and 4th digits.  Surgeon may have options now that skin is healed and patient digit mobility is on the gain.  Discharge now with above [Home Exercise Program]." Doc. 9-4 at 25.  These notes contradict Allen's statement in the complaint that his physical therapist stated "surgical intervention would be requisite." Doc. 1 at 5.

In accordance with the physical therapist's suggestion and upon approval by correctional medical personnel, Dr. Turki again examined Allen on July 10, 2014 and determined that no surgical intervention or other treatment was necessary at that time. Doc. 9-4 at 29–32; *see* Doc. 1 at 5 ("On July 10, 2014, I was seen again by Dr. Turki who stated that I, at 45 years of age, was 'too young' for the knuckle implant[.]").  When

8

Allen returned to Draper from his consultation with Dr. Turki, he underwent assessment by the facility's medical staff.  During this assessment, the attending nurse noted that the "patient [is] disgruntled requesting to have a second opinion." Doc. 9-3 at 14.  The nurse scheduled Allen an appointment with Dr. Mendez on July 17, 2017 to discuss the matter.  At this appointment, Allen advised Dr. Mendez that he could not close his left hand and sought surgical intervention to increase the flexibility in his hand. Doc. 9-3 at 15.  Based on Allen's complaints, Dr. Mendez contacted Dr. Turki who advised that he "will operate for pain [control but] not mobility." Doc. 9-3 at 15.

On October 23, 2014, Dr. Mendez requested and received approval for a second orthopedic consultation with Dr. Thomas Powell, an orthopedic surgeon at Brookwood Hospital in Birmingham, Alabama, for further evaluation of Allen's left hand. Doc. 9-4 at 38.  Dr. Powell examined Allen on November 20, 2014 and compiled the following notes:

> **Examination**:
> General Examination:
>   Exam reveals a well-healed scar over the dorsum of the left hand with normal tendon function. He does have a slight deformity which appears to be an extensive deformity in the proximal phalanx of the forth finger. Neurologically he appears intact except for some numbness around the scar. He can make a fist but lacks about 1 cm from the pulp to palm in the fourth ray.
> . . .
> **Assessment:**
>   1.  Pain in joint, hand[;]
>   2.  Malunion of fracture[.]
> **Plan:**
>   **1.  Pain in joint, hand[.]**
>   Notes: Today, we discussed [his] treatment options and I would recommend referral to Dr. Ostrowski for further evaluation and possible

definitive treatment.  I think this is appropriate as he is a left hand dominant gentleman but for now, he can resume his activities as tolerated as all the fractures are healed.

**Procedures:**

  X-Rays:

   . . . Three-view x-rays of his left hand show a well-healed proximal fourth phalanx fracture with deformity.  It appears this may have represented an intracondylar fracture.  It is well-healed.  There is also a cystic lesion in the scaphoid but no evidence of fracture.  There are no acute findings.

Doc. 9-4 at 40.  Allen alleges that Dr. Powell identified surgery as a possible treatment option but advised that he would not perform the surgery. Doc. 1 at 5.  However, Dr. Powell's notes indicate that he "recommend[ed] referral to Dr. Ostrowski for further evaluation and possible definitive treatment." Doc. 9-4 at 40.

On December 22, 2014, the on-site nurse practitioner, Ms. Barnette, completed a consultation request seeking approval for referral of Allen to Dr. Ostrowski for additional evaluation of his left hand. Doc. 9-4 at 46.  On January 16, 2015, Nurse Barnette "spoke to Dr. Crocker [regarding] referral out to see Dr. Ostrowski.  Doctor Crocker stated that inmate would not be sent out to see another [specialist] provider." Docs. 9-3 at 16 & 9-4 at 46.

On February 19, 2015, Allen reported to the health care unit complaining of "decreased dexterity" in his left hand. Doc. 9-3 at 16.  Dr. Stone noted that Allen "has seen Dr. Turki (hand specialist) and Dr. Powell.  Further referral has been rejected." Doc. 9-3 at 16.  Dr. Stone examined Allen and "explained that there was no guarantee" that surgery would improve his condition and advised that "there [are also] potential complications related to [hand] surgery." Doc. 9-3 at 16.

## IV.  DISCUSSION

Allen contends that the defendants acted with deliberate indifference when Dr. Crocker refused to approve the referral to Dr. Ostrowski for an evaluation of his left hand and a third opinion regarding a possible treatment plan.  The defendants adamantly deny that their actions constituted deliberate indifference to Allen's medical needs.  In support of this assertion, the defendants maintain that Allen received all necessary treatment for the injuries to his left hand, including referrals to two free-world orthopedic specialists, both of whom declined to perform surgery on his hand.

To prevail on a claim concerning an alleged denial of medical treatment, an inmate must, at a minimum, show that the defendant acted with deliberate indifference to a serious medical need. *Estelle v. Gamble*, 429 U.S. 97 (1976); *Taylor v. Adams*, 221 F.3d 1254 (11th Cir. 2000); *McElligott v. Foley*, 182 F.3d 1248 (11th Cir. 1999); *Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir. 1989).  Specifically, medical personnel may not subject an inmate to "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle*, 429 U.S. at 106; *Adams v. Poag*, 61 F.3d 1537, 1546 (11th Cir. 1995) (holding, as directed by *Estelle*, that a plaintiff must establish "not merely the knowledge of a condition, but the knowledge of necessary treatment coupled with a refusal to treat or a delay in [the acknowledged necessary] treatment").

As determined by the Supreme Court and Eleventh Circuit, neither medical malpractice nor negligence equate to deliberate indifference:

> That medical malpractice—negligence by a physician—is insufficient to
> form the basis of a claim for deliberate indifference is well settled. *See*

*Estelle v. Gamble,* 429 U.S. 97, 105–07, 97 S. Ct. 285, 292, 50 L.Ed.2d 251 (1976); *Adams v. Poag,* 61 F.3d 1537, 1543 (11th Cir. 1995).  Instead, something more must be shown.  Evidence must support a conclusion that a prison [medical care provider's] harmful acts were intentional or reckless. *See Farmer v. Brennan,* 511 U.S. 825, 833–38, 114 S. Ct. 1970, 1977–79, 128 L.Ed.2d 811 (1994); *Cottrell v. Caldwell,* 85 F.3d 1480, 1491 (11th Cir. 1996) (stating that deliberate indifference is equivalent of recklessly disregarding substantial risk of serious harm to inmate); *Adams,* 61 F.3d at 1543 (stating that plaintiff must show more than mere negligence to assert an Eighth Amendment violation); *Hill v. DeKalb Regional Youth Detention Ctr.,* 40 F.3d 1176, 1191 n. 28 (11th Cir. 1994) (recognizing that Supreme Court has defined "deliberate indifference" as requiring more than mere negligence and has adopted a "subjective recklessness" standard from criminal law); *Qian v. Kautz,* 168 F.3d 949, 955 (7th Cir. 1999) (stating "deliberate indifference" is synonym for intentional or reckless conduct, and that "reckless" conduct describes conduct so dangerous that deliberate nature can be inferred).

*Hinson v. Edmond*, 192 F.3d 1342, 1345 (11th Cir. 1999).

In order to establish "deliberate indifference to [a] serious medical need . . . , Plaintiff[] must show: (1) a serious medical need; (2) the defendant['s] deliberate indifference to that need; and (3) causation between that indifference and the plaintiff's injury." *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1306–07 (11th Cir. 2009).  When seeking relief based on deliberate indifference, an inmate is required to establish "an objectively serious need, an objectively insufficient response to that need, subjective awareness of facts signaling the need and an actual inference of required action from those facts." *Taylor*, 221 F.3d at 1258; *McElligott*, 182 F.3d at 1255 (holding that, for liability to attach, the official must know of and then disregard an excessive risk to the prisoner).  Regarding the objective component of a deliberate indifference claim, the plaintiff must first show "an objectively 'serious medical need[]' . . . and second, that the

response made by [the defendants] to that need was poor enough to constitute 'an unnecessary and wanton infliction of pain,' and not merely accidental inadequacy, 'negligen[ce] in diagnos[is] or treat[ment],' or even '[m]edical malpractice' actionable under state law." *Taylor*, 221 F.3d at 1258 (internal citations omitted).  A medical need is serious if it "'has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Goebert v. Lee Cty.*, 510 F.3d 1312, 1325 (11th Cir. 2007) (quoting *Hill*, 40 F.3d at 1187).  In addition, "to show the required subjective intent . . . , a plaintiff must demonstrate that the public official acted with an attitude of deliberate indifference . . . which is in turn defined as requiring two separate things[:] awareness of facts from which the inference could be drawn that a substantial risk of serious harm exists [and] draw[ing] of the inference[.]" *Taylor*, 221 F.3d at 1258 (internal quotation marks and citations omitted).  Thus, deliberate indifference occurs only when a defendant "knows of and disregards an excessive risk to inmate health or safety; the [defendant] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he must also draw the inference." *Farmer*, 511 U.S. at 837; *Johnson v. Quinones*, 145 F.3d 164, 168 (4th Cir. 1998) (holding that defendant must have actual knowledge of a serious condition, not just knowledge of symptoms, and ignore known risk to serious condition to warrant finding of deliberate indifference).  Furthermore, "an official's failure to alleviate a significant risk that he should have perceived but did not,

while no cause for commendation, cannot under our cases be condemned as the infliction

of punishment." *Farmer*, 511 U.S. at 838.

> In articulating the scope of inmates' right to be free from deliberate indifference, . . . the Supreme Court has . . . emphasized that not "every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment." *Estelle,* 429 U.S. at 105, 97 S. Ct. at 291; *Mandel* [*v. Doe*, 888 F.2d 783, 787 (11th Cir. 1989)]. Medical treatment violates the eighth amendment only when it is "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Rogers*, 792 F.2d at 1058 (citation omitted). Mere incidents of negligence or malpractice do not rise to the level of constitutional violations. *See Estelle,* 429 U.S. at 106, 97 S. Ct. at 292 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."); *Mandel*, 888 F.2d at 787–88 (mere negligence or medical malpractice 'not sufficient' to constitute deliberate indifference); *Waldrop,* 871 F.2d at 1033 (mere medical malpractice does not constitute deliberate indifference). Nor does a simple difference in medical opinion between the prison's medical staff and the inmate as to the latter's diagnosis or course of treatment support a claim of cruel and unusual punishment. *See Waldrop,* 871 F.2d at 1033 (citing *Bowring v. Godwin,* 551 F.2d 44, 48 (4th Cir. 1977)).

*Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991); *Taylor*, 221 F.3d at 1258

(internal quotation marks and citation omitted) (holding that, to show deliberate

indifference, the plaintiff must demonstrate a serious medical need and then must

establish that the defendant's response to the need was more than "merely accidental

inadequacy, negligence in diagnosis or treatment, or even medical malpractice actionable

under state law"). Moreover, "as *Estelle* teaches, whether government actors should have

employed additional diagnostic techniques or forms of treatment is a classic example of a

matter for medical judgment and therefore not an appropriate basis for grounding liability

under the Eighth Amendment." *Adams*, 61 F.3d at 1545 (internal quotation marks and

citation omitted); *Garvin v. Armstrong*, 236 F.3d 896, 898 (7th Cir. 2001) ("A difference of opinion as to how a condition should be treated does not give rise to a constitutional violation."); *Hamm v. DeKalb County*, 774 F.2d 1567, 1575 (11th Cir. 1985) (holding that the mere fact an inmate desires a different mode of medical treatment does not amount to deliberate indifference violative of the Constitution); *Franklin v. Oregon*, 662 F.2d 1337, 1344 (9th Cir. 1981) (holding that prison medical personnel do not violate the Eighth Amendment simply because their opinions concerning medical treatment conflict with that of the inmate-patient); *Amarir v. Hill*, 243 F. App'x 353, 354 (9th Cir. 2007) (holding that defendant's "denial of plaintiff's request to see an outside specialist . . . did not amount to deliberate indifference"); *Arzaga v. Lovett*, 2015 WL 4879453, at *4 (E.D. Cal. Aug. 14, 2015) (finding that plaintiff's preference for a second opinion is "not enough to establish defendant's deliberate indifference" as the allegation does "not show that defendant knowingly disregarded a serious risk of harm to plaintiff" nor that defendant "exposed plaintiff to any serious risk of harm"); *Dixon v. Jones*, 2014 WL 6982469, at *9 (M.D. Ala. Dec. 9, 2014) (finding that jail physician's denial of second opinion regarding treatment provided to inmate for physical injuries suffered during attack by another inmate did not constitute deliberate indifference); *Youmans v. City of New York*, 14 F. Supp. 357, 363–64 (S.D.N.Y. 2014) (noting that "courts in the Second Circuit have held that failure to provide a second opinion is not generally a violation of a prisoner's Eighth Amendment rights"); *Schomo v. City of N.Y.*, 2005 WL 756834, at *10 (S.D.N.Y. Apr. 4, 2005) (finding that doctor's decision to deny inmate a second opinion

regarding his physical capabilities did not constitute deliberate indifference "since prisoners are not constitutionally entitled to a second medical opinion").

The defendants submitted affidavits and relevant medical records in response to the complaint filed by Allen. In his affidavit, Dr. Hood makes the following pertinent statements:

> I have been employed with Corizon, LLC, f/k/a Corizon Health, Inc. since November of 2007. I was originally employed as Corizon's Associate Regional Medical Director, but currently serve as the Regional Medical Director. I have been licensed to practice medicine in the State of Alabama since 1975. . . . As the Associate Regional Medical Director and Regional Medical Director, I am not assigned to any one Alabama Department of Corrections ("ADOC") facility.
>
> As a general matter, I oversee utilization management, which is the process employed by Corizon to manage and facilitate the referral of patients to off-site specialty medical providers like orthopedic specialist[s], oncologists and cardiologists. When I undertake the utilization review process for any off-site referral, I generally receive selected medical records from a patient's medical records. I do not receive the entire medical record, though I may request additional records or contact the referring provider in the event that I have questions not answered by the provided information.
>
> Dr. Woodrow A. Myers, Jr. is the Chief Executive Officer of Corizon Health, Inc. Dr. Myers works primarily out of the corporate headquarters located in Brentwood, Tennessee. He does not participate in the utilization management process nor does he participate in individual treatment decisions related to any individual patients within the Alabama Department of Corrections system.
>
> I conducted several utilization reviews for Mr. Vincent Allen . . . an inmate at Draper Correctional Facility in Elmore, Alabama. I conducted th[ese] review[s] after he fractured a portion of his left hand and was referred to an orthopedic specialist for further evaluation. While I do not independently recall the exact documents that I received in order to conduct my review, I did review the medical records pertaining to Mr. Allen's fractured left hand and the post-injury care received during his incarceration at Draper in preparing this Affidavit.
>
> As soon as Mr. Allen injured his left hand while working on a welding project, he was immediately transported from Draper to the local emergency room on January 16, 2014. The emergency room staff

confirmed that Mr. Allen fractured his ring finger at the base, near the knuckle on his left hand. They applied stitches to the open wound on Mr. Allen's left hand and referred him to an orthopedic specialist for further evaluation. When the medical staff evaluated Mr. Allen on January 17, 2014, they noted the pendency of an off-site appointment with an orthopedic specialist and further noted that Mr. Allen did not voice any complaints of numbness or significant pain which was not controlled with his existing medications.

On January 22, 2014, Mr. Allen saw the off-site orthopedic specialist at which time he applied a splint and scheduled Mr. Allen for a follow-up appointment to remove his stitches. For the next three (3) months (*i.e.* February through April of 2014), Mr. Allen continued to return to the off-site orthopedic specialist and I continued to approve each of these requests for follow-up appointments with the off-site specialist.

When the off-site orthopedic specialist saw Mr. Allen on February 5, 2014, he removed Mr. Allen's stiches and told him to return for a follow-up examination in 1 month. In his notations from this appointment, the off-site orthopedic specialist wrote, "[t]he fracture is so comminuted and the skin so tenuous over it **I just do not think there is anything I can do to make this better**." The follow-up appointment occurred on March 28, 2014. In the exam notation, the off-site orthopedic specialist made several inaccurate assumptions regarding the lack of physical therapy capabilities within the ADOC system. Such services are routinely provided within the ADOC system when they are medically necessary. Following this appointment, the Draper medical staff continued to discuss and obtain clarification regarding the orthopedic specialist's recommendations and treatment orders for Mr. Allen. These discussions culminated in a discussion between the site medical director, who treats patients at Draper, and the orthopedic specialist on April 15, 2014, when the orthopedic specialist stated there was a "very small chance" that he could improve the current condition of Mr. Allen's left hand with additional surgery followed by several weeks of physical therapy. However, as the site medical director noted, the specialist indicated that the likelihood of improvement was "very doubtful." I was not privy to these communications.

On April 30, 2014, I approved the provision of physical therapy services to Mr. Allen, as recommended by the off-site orthopedic specialist. Beginning May 9, 2014, Mr. Allen received approximately three (3) weeks of physical therapy [by an outside physical therapist].

On June 17, 2014, I approved another follow-up appointment for Mr. Allen with the orthopedic specialist following the completion of the three-week physical therapy regimen. In July of 2014, Mr. Allen attended a follow-up appointment with the orthopedic specialist, which I approved.

As indicated in his medical chart, no further treatment was recommended by the orthopedic specialist after this July, 2014, follow-up evaluation other than continued follow-up examinations. Following this appointment, I understand that Mr. Allen requested a "second opinion."

Despite the absence of any medical justification for a second opinion related to his condition or any obvious deficiencies with the opinions of his treatment by the off-site orthopedic specialist, I approved an evaluation by another off-site orthopedic specialist for evaluation in October of 2014. Mr. Allen subsequently saw this other off-site orthopedic specialist on November 20, 2014, at which time he recommended referral of Mr. Allen to a third off-site orthopedic specialist in Birmingham by the name of Dr. Ostrowski. In a written request dated November 22, 2014, the clinician overseeing Mr. Allen's treatment for his left hand requested permission to refer Mr. Allen to Dr. Ostrowski. Following submission of this form, the then-Medical Director, Dr. Bobby Crocker, notified the clinician that this request was not approved. While I was not present during this conversation nor consulted on the decision by Dr. Crocker, it is my understanding that this decision was made in light of the scope of care provided to Mr. Allen prior to January of 2015, and the extensive evaluations conducted at that time without any clear surgical remedy to improve Mr. Allen's condition. It is obvious from the medical records that any further consultation with any other off-site orthopedic specialist would be highly speculative and likely result in no meaningful benefit to Mr. Allen. As further indicated throughout Mr. Allen's medical records, the medical staff continued to treat all of his complaints of pain or discomfort with medication.

As stated previously, my participation in the provision of medical services to Mr. Allen was limited to the approval of certain requests for off-site specialty medical care. . . . As indicated in [the medical] records, no one has refused to provide Mr. Allen with any necessary medical treatment and the medical staff overseeing his care has responded in a timely and appropriate fashion to all of his complaints and concerns.

Doc. 9-1 at 1–5 (paragraph numbers and citations to medical records omitted).

Dr. Crocker addresses the allegation regarding his denial of a third medical opinion, in relevant part, as follows:

I was formerly employed by Corizon Health, Inc. (as well as its predecessor Correctional Medical Services, Inc.) as the Regional Medical Director for the State of Alabama from approximately October 2007 to May 2015. During my tenure as Regional Medical Director and as of the date of this

Affidavit, I am licensed to practice medicine in the States of Alabama and Georgia. As the Regional Medical Director, I was not typically assigned to any one Alabama Department of Corrections ("ADOC") facility in terms of providing direct patient care, but generally oversaw the clinicians or site medical directors working at each of these facilities. That being said, there were occasions during my tenure as Regional Medical Director when I provided direct medical care to inmates in the absence of a facility's medical director or at the request of the medical director.

Part of my duties as Regional Medical Director included oversight of a process known as "utilization management." Utilization management is the process employed by a medical provider such as Corizon to manage and facilitate the referral of patients to off-site specialty medical providers like orthopedic specialist[s], oncologists and cardiologists. So, in the event that one of our treating physicians (*i.e.*, site medical directors) concluded that a patient may need further testing, evaluation or treatment by a medical specialist located outside of the confines of the facility, he or she would submit a request to my office for approval. In reviewing these requests for off-site medical treatment, I would also generally receive selected medical records from a patient's medical records detailing the care provided to date and the underlying circumstances which, in the site medical director's opinion, justified consideration of a referral to an off-site referral. Dr. Hugh Hood, the Associate Regional Medical Director during my employment in Alabama, also participated in the review of off-site referrals and utilization management requests.

I have been notified of the addition of my name to a lawsuit filed by Mr. Vincent Allen . . . who was incarcerated at the Draper Correctional Facility in Elmore, Alabama in approximately November of 2014. I do not have any independent recollection of Mr. Allen. As evident through his medical records (which I reviewed in preparing this affidavit), his medical care at Draper was directed by the members of the medical staff at Draper. I did not directly participate in the provision of medical care to him and was not physically present during the provision of the medical care detailed throughout his medical records. In fact, as discussed below, the only occasion that I provided any opinion related to Mr. Allen related to the particular off-site request for a third opinion related to his hand condition, which I did not believe at that time, nor believe today, was medically justified. Beyond my opinion that Mr. Allen should not receive a "third opinion," given the clarity of instruction from the prior orthopedic specialists who participated in his case, this was and remains, my informed and reasoned medical opinion.

As indicated by Mr. Allen in the documents filed with the Court, he injured his left hand while working at Draper on some type of welding

project during the January, 2014, timeframe.  I further understood that he was immediately transported to the local emergency room where he received medical attention for the injuries sustained. Following the evaluation and treatment in the local emergency room, I understand that Mr. Allen was subsequently monitored by the Draper medical staff and first saw an orthopedic specialist on January 22, 2014. I also recall that Mr. Allen continued to see [the] orthopedic specialist for frequent follow-up appointments . . . and, during the February 5, 2014, appointment, [] the orthopedic specialist noted that Mr. Allen's condition had likely reached its maximum improvement through medical treatment.

. . .

After Mr. Allen completed physical therapy and attended another follow-up appointment with the orthopedic specialist overseeing his care for a six-month period, Mr. Allen then received a second opinion related to his condition.  The notations from this appointment included a suggestion of a possible referral to a third orthopedic specialist.  I recall carefully reviewing the documentation related to this request.  It was clear to me then, and remains true today, that the referral to the third orthopedic specialist—Dr. Ostrowski—was not based upon any belief that Mr. Allen would benefit in any way from a referral to Dr. Ostrowski.  If anything, it appeared to me that any procedure possibly proposed by Dr. Ostrowski would be entirely speculative and elective—not medically necessary.  If I believed that Mr. Allen needed [a third opinion] or, stated differently, [this referral] would medically benefit him, I would have approved this off-site request.  However, the observations, conclusion[s] and recommendations of Mr. Allen's prior orthopedic specialists were very clear—Mr. Allen had received comprehensive care for his condition between January and October of 2014 and no one could say whether Mr. Allen would receive any benefit of any kind from any further surgical procedure.  Therefore, in my professional medical opinion based upon my review of the information available to me, I did not believe this request was justified or appropriate.

Doc. 21-1 at 1–4 (paragraph numbers and citations to medical records omitted).

Initially, the court notes that it is not clear Allen even suffered from a serious medical need at the time Dr. Crocker denied the referral to Dr. Ostrowski for a third opinion because "all the fractures [had] healed." Doc. 9-4 at 40.  Nevertheless, assuming *arguendo* that a serious medical need existed at this time, the court concludes that the

actions of Dr. Crocker and the other medical defendants did not violate Allen's constitutional rights.  Specifically, Dr. Crocker did not act in a manner that was "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to the fundamental fairness." *Harris*, 941 F.2d at 1505.  Rather, the evidence before the court demonstrates that on the day of the incident Allen received treatment for his injured hand at the emergency room of a free-world hospital.  Correctional medical personnel thereafter routinely examined Allen for complaints related to his injured left hand; prescribed medications to alleviate his pain; referred him to Dr. Turki, a free-world board certified orthopedic surgeon specializing in hand surgery, on four separate occasions for evaluation and treatment of his hand; provided physical therapy to Allen via a free-world physical therapist; and referred him to Dr. Powell, a free-world board certified orthopedic surgeon specializing in traumatic injuries, for an additional evaluation and second opinion regarding treatment of his left hand.  Dr. Crocker thereafter denied a request that Allen be referred to Dr. Ostrowski for a third opinion regarding possible treatment options because Dr. Crocker deemed this referral medically unnecessary.  Whether Dr. Crocker should have referred Allen to Dr. Ostrowski for further evaluation of his hand and a third opinion on potential treatment options "'is a classic example of a matter for medical judgment' and therefore not an appropriate basis for grounding liability under the Eighth Amendment." *Adams*, 61 F.3d at 1545 (internal citation omitted); *see Hamm*, 774 F.2d at 1505 (holding that inmate's desire for additional form of medical treatment does not constitute deliberate indifference violative

21

of the Constitution); *Franklin*, 662 F.2d at 1344 (holding that simple divergence of opinions between medical personnel and inmate-patient do not violate the Eighth Amendment); *Youmans*, 14 F. Supp. at 363-64 (finding that failure to provide second or additional medical opinions generally does not establish deliberate indifference so as to violate a prisoner's Eighth Amendment rights).

Under the circumstances of this case, the court concludes that the lack of a referral to a third orthopedic specialist for evaluation of Allen's left hand injuries did not constitute deliberate indifference. Allen has failed to present any evidence showing that the defendants knew that the manner in which they addressed the treatment of his hand created a substantial risk of serious harm to him and with this knowledge consciously disregarded such risk. The record is therefore devoid of evidence—significantly probative or otherwise—showing that Dr. Crocker or any other health care provider acted with deliberate indifference to a serious medical need experienced by Allen. Consequently, summary judgment is due to be granted in favor of the defendants.

## V.  CONCLUSION

Accordingly, it is the RECOMMENDATION of the Magistrate Judge that:

1.      The defendants' motion for summary judgment be GRANTED.

2.      Judgment be GRANTED in favor of the defendants.

3.      This case be DISMISSED with prejudice.

4.      The costs of this proceeding be taxed against the plaintiff.

It is further ORDERED that on or before **December 11, 2017** the parties may file objections to this Recommendation.   A party must specifically identify the factual findings and legal conclusions in the Recommendation to which the objection is made; frivolous, conclusive, or general objections will not be considered.

Failure to file written objections to the proposed findings and recommendations in the Magistrate Judge's report shall bar a party from a *de novo* determination by the District Court of factual findings and legal issues covered in the report and shall "waive the right to challenge on appeal the District Court's order based on unobjected-to factual and legal conclusions" except upon grounds of plain error if necessary in the interests of justice. 11TH Cir. R. 3-1; *see Resolution Trust Co. v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989).

DONE this 27th day of November, 2017.

GRAY M. BORDEN
UNITED STATES MAGISTRATE JUDGE